IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**PHILLIP RAMOS-OQUENDO,**
    Petitioner,

    v.

**COMMISSIONER OF SOCIAL SECURITY**,
    Defendant.

Civil No. 19-1305 (BJM)

**OPINION AND ORDER**

    Phillip Ramos-Oquendo ("Ramos") seeks review of the Commissioner's finding that he is not disabled and thus not entitled to disability benefits under the Social Security Act (the "Act"). 42 U.S.C. § 423. Ramos argues the Commissioner's decision should be reversed because the administrative law judge ("ALJ")'s residual functional capacity ("RFC") finding and step five non-disability determination were not supported by substantial evidence. Docket Nos. 1, 12. The Commissioner opposed. Docket Nos. 10, 15. This case is before me on consent of the parties. Docket Nos. 6-7. After careful review of the administrative record and the briefs on file, the Commissioner's decision is **affirmed**.

**STANDARD OF REVIEW**

    After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial

evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the ALJ assesses the claimant's RFC, which is used at steps four and five. An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). The ALJ determines at step four whether the impairments prevent the claimant from doing the work he has performed in the past. If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(f). If he cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national economy in view of his RFC, as well as his age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(g).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Rosario v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989).

Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following is a summary of the treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the Social Security transcript ("Tr.").

Ramos was born on December 16, 1971, does not understand the English language (communicates in the Spanish language), completed high school, and worked as a carpenter (medium work, semi-skilled). Ramos applied for disability insurance benefits, claiming to be disabled since October 3, 2014 (onset date) at age 42[1] due to low back and cervical spine pain, blurred left-eye vision, a thyroid condition, and a severe psychiatric condition. Ramos met the insured status requirements of the Act through March 31, 2018. Tr. 58, 336, 348, 368-369, 483-484, 494-495.

*Treating Sources*

**State Insurance Fund**

Ramos was treated for lower back pain under the auspices of the State Insurance Fund ("SIF") from July 2000 to November 2003. Most notes are illegible. Medications and physical therapy were prescribed. Tr. 91-124, 567-595.

At initial interview on July 18, 2000, Ramos reported having felt a strong pain in his lower back while lifting steel scaffolding. Tr. 112, 586. A July 27, 2000 lumbosacral spine x-ray showed negative results. The intervertebral disc spaces and vertebral bodies height were well maintained. Bony alignment was intact. No bony lesions or fractures were noted. Tr. 111-112, 585-586. Notes from August to November 2000 show treatment for a lumbosacral sprain. Ramos reported pain in

---

[1] Ramos was considered to be a younger individual (Tr. 29), and "[i]f you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(c).

his lower back and left leg when raising it. He showed limited flexion and extension. He reported that the medication did not ease the pain. Tr. 104-110, 124, 579-584, 595.

October 2000 progress notes also show a diagnosis of iliolumbar myositis. He showed a mild shortening in his hamstrings. Gait was normal. SLR test was at 90 degrees bilateral on October 2[2] and at 80 degrees bilateral on October 27. On October 2, Ramos complained of constant pain in his lower back, which got worse with force exertion. He took medication daily because he felt constant pain. He was sensitive to pressure in the sacral-coccyx area. There was no spasm in the paravertebral-lumbar region. He could squat. Ramos felt better on October 27 and was taking less medication but complained of discomfort in the coccyx area during prolonged sitting. Tr. 122-123, 593-594

In January 2001, Ramos reported feeling a stabbing sensation in the coccyx area when he slept on his left side. He showed a mild shortening in his hamstrings, a normal gait, and no pain at pressure or spams in the lumbosacral area of the coccyx. Straight Leg Raise ("SLR") test was positive on both sides at 90 degrees. Tr. 118, 590.

Notes indicate that Ramos finished physical therapy in February 2001 but still felt pain. Ramos was referred to a neurosurgeon. A March 27, 2001 MRI of the lumbosacral spine showed herniated discs (herniated nucleus pulposus or "HNP") at the L5-S1 level, which appeared to be impinging on the thecal sac and dorsal root. In March, April and May 2001, Ramos felt pain with swelling in his lower back radiating to his left leg. Sensation was diminished in his left side and big toe. SLR test was positive. Tr. 98-103, 114, 573-578, 588.

A note from December 2002, indicates a diagnosis for HNP at the L5-S1 level, and that Ramos came in with pain but his range of motion was complete and he had no spasms. Tr. 93, 596.

In October 2003, Ramos reported pain on the right side of his back, radiating to his left and foot, and pain and muscle spasm at flexion of his right lateral trunk. Ramos was administered Toradol 60 mg and Kenalog 40 mg. He was also prescribed medications (Neurontin, Skelaxin). Tr. 97, 572.

On November 13, 2003, he was referred to receive physical therapy for his lower back pain. Prognosis was fair. Tr. 94-95, 570.

---

[2] Progress note translation incorrectly states 2001. The original progress note states "2 octubre 2000." Tr. 123, 594.

**Ponce Health Sciences University**

From November 2010 to April 2017, Ramos was treated for major depression, recurrent. Medications were prescribed. Tr. 168-183, 287-307, 316-335, 641-656, 810-830, 874-893.

A psychiatric evaluation dated September 17, 2013 indicates that Ramos had been receiving treatment for more than ten years. He was cooperative, logical, coherent, and relevant. Ramos claimed to sometimes having visual hallucinations but denied having suicidal or homicidal ideas. His Global Assessment of Functioning ("GAF") score was 60. Tr. 169-170, 642-643, 655.

Ramos's mood in November 2010 was check-marked as depressed. His attitude was cooperative, and his motor activity was calm. His affect was appropriate. He showed no cognitive difficulties. His thought process was intact, and he showed no suicidal or homicidal thoughts. There is a rectangle drawn around the word hallucinations in this progress note. GAF score was at 80. Tr. 183, 656.

Progress notes from February 2011, December 2012, June 2013, September 2014, and January 2015 show that Ramos's attitude was cooperative. His mood was euthymic, and his affect was appropriate. He showed no cognitive difficulties, and his thought process was intact. He showed no suicidal or homicidal thoughts, psychosis, or obsessions. His insight, judgment, and reliability were good. GAF score wat at 65. Tr. 171-172, 177, 179, 182, 644-645, 650, 652.

A psychiatric evaluation dated September 17, 2013 indicates that Ramos's main complaint was anxiety and hallucinations. He indicated undergoing treatment for more than ten years. He was approachable, cooperative, affable, organized, logical, coherent, and relevant. He sometimes had visual hallucinations. He denied having homicidal or suicidal thoughts. His GAF score was at 60. Tr. 306-307, 829-830.

Progress notes from November 2014 show that his mood was depressed and anxious, his speech was slow, and he had cognitive difficulties in attention. Tr. 173, 646.

Notes from January, April, July, and October 2015 indicate that Ramos was cooperative and calm. His mood was euthymic, his affect appropriate, his speech normal, and his thought process intact. He had no cognitive difficulties. He had no suicidal or homicidal ideas or psychosis. His insight, judgment, and reliability were good. His condition was stable. His GAF score was at 65. Tr. 812-815.

Ramos continued treatment at the University's Wellness Center from January 2016 to April 2017 for major depressive disorder, recurrent, severe with psychotic symptoms. Medications (Ativan, Paxil, Risperdal, Trazodone) were prescribed. Tr. 316-335, 874-893.

Notes from January 2016 show that Ramos was cooperative, calm, with a euthymic mood, appropriate affect, normal speech, intact thought process, and no suicidal or homicidal thoughts or psychosis. He showed cognitive difficulties in his short-term memory. His insight, judgment, and reliability were fair. Tr. 893.

Notes from April 2016 indicate that his mood was anxious and he had auditive hallucinations. Tr. 879. Notes from October 2016, and January and April 2017 indicate that his attitude was alert and cooperative, his motor activity was calm, his mood was euthymic, and his affect was appropriate. There was no perceptual distortion. He did not have hallucinations, or suicidal or homicidal thoughts. He acknowledged his problem (had insight), and had adequate judgment and impulse control, and appropriate self-esteem. He was open to and could relate to his interviewer. Tr. 875-876, 883-884, 889. Notes from January and April 2017 also indicate that Ramos's condition was stable. Ramos was asymptomatic with therapy. He denied having suicidal or homicidal ideation. He understood to immediately seek medical attention if his physical or emotional status deteriorated. He was oriented to avoid operating machinery or motor vehicles while under the influence of his medications. Tr. 884, 890.

**Ponce Advance Medical Group**

Ramos was treated by Dr. Norma Santos at the Ponce Advance Medical Group for low back pain, herniated lumbar disc, and hypothyroidism from January 2013 to July 2017. Handwritten notes are mostly illegible. Medications and physical therapy were prescribed. Ramos was also frequently administered intramuscular injections. In 2013, he was injected two to three times monthly, about every other month. The record also reflects referrals for evaluation by an endocrinologist, rheumatologist, physiatrist, and ophthalmologist. Tr. 125-167, 192-218, 233-286, 598-640, 720-741, 756-801.

A lumbosacral spine CT scan dated February 17, 2014, performed by Dr. Jorge Torres ("Dr. Torres"), reveals minimal central protrusion of the nucleus pulposum at the C3-C4 and C4-C5 level, causing compression of the thecal sac. Nerve roots appeared to be normal. The rest of the intervertebral disc spaces were preserved. Facet joints were normal and the surrounding soft tissues were within normal limits. Tr. 130, 596, 603. An x-ray also showed evidence of central protrusion

of the nucleus pulposum at the L5-S1 level, causing compression of the thecal sac and nerve roots. The same goes as to the L2-L3, L3-L4, and L4-L5 levels, but with minimal compression of the thecal sac. Tr. 206, 732.

A cervical spine CT scan dated October 1, 2014 revealed central protrusion of the nucleus pulposum at the L2-L3, L3-L4, L4-L5, and L5-S1 level, causing compression of the thecal sac. There was also compression of the nerve roots at the L5-S1 level. Tr. 597.

On October 29, 2014, neurosurgeon Dr. Ramón Del Prado evaluated Ramos and found that the neurological exam showed no evidence of chord or nerve compression. He recommended physical therapy, but not surgery. Tr. 268, 783.

A cervical MRI dated May 8, 2015, revealed significant disc herniation at C3-C4 with cervical cord impingement and, to a lesser extent at C4-C5. Tr. 196, 691, 724, 801. Lumbar MRI revealed degenerative facet joint changes and small central and left-sided disc herniation at L5-S1. Tr. 197, 690, 725, 800.

A CT scan of the lumbosacral spine from February 2016 revealed evidence of central and lateral protrusion of the nucleus pulposum at the L5-S1 level , causing compression of the thecal sac and nerve roots. There was also evidence of narrowing of the intervertebral disc space and degenerative changes of the facet joints. Tr. 847-848.

A thoracic CT dated June 2017 shows focal left-sided osteophytosis of the posterior vertebral endplates at T8-T9 impinging the spine, and mild thoracic central spinal canal stenosis at T10-T11 and T11-T12. Tr. 900.

There is also evidence of treatment for hypothyroidism and gastritis from November 2013 to September 2015 by endocrinologist Dr. Ismael Rodríguez upon referral from Dr. Santos, but the handwritten notes are illegible. An ultrasound of the thyroid gland at Tr. 222, dated May 5, 2015 revealed that it was normal bilaterally in the upper limits, with an inhomogeneous echogenicity, suggestive of goiter. Bilateral nodules suggested benign nodules. This portion of the record contains a lot of lab results. Tr. 219-284, 742-801. A progress note from June 2014 indicates that Ramos visited Dr. José Torres-Vega, gastroenterologist, who prescribed medications for gastritis. Tr. 267.

**Dr. José Torres-Vega**

Dr. José Torres-Vega, gastroenterologist, treated Ramos from October 2013 to July 2017 for gastroesophageal reflux disease ("GERD"), irritable bowel syndrome ("IBS"), HNP,

hypothyroidism, hyperglycemia, glaucoma, and ocular infarction. Ramos was placed on a high fiber diet and his conditions were controlled with medications. Notes from 2015 indicate that Ramos was doing well. Notes from 2016 indicate that Ramos is well while taking his medications. Tr. 657-689, 908-916.

**Dr. José Vázquez-Díaz and Dr. Noel De León**

Ramos was examined by ophthalmologist Dr. José Vázquez from January to October 2015 (Tr. 802-809) and by retinologist Dr. Noel De León from February to December 2016. This evidence consists of progress notes with numbers and medical abbreviations and eye imaging results, unintelligible to the lay person. Tr. 849-899. The record indicates that on January 2015, Ramos reported seeing blurry through his right eye. Tr. 266. There is a diagnosis for central retinal vein occlusion and glaucoma by ophthalmologist Dr. Vázquez. Tr. 255, 260-264.

*Procedural History*

On March 17, 2015, Ramos applied for disability insurance benefits claiming to be disabled since October 3, 2014 (Tr. 18, 483) and filed a function report, describing the effects of severe pain in his cervical area, shoulders, and back. His legs and feet would get numb. He could not apply strength or hold objects. He had lost vision in his left eye. He was depressed, anxious, and in low spirits. Ramos reported that due to his conditions, he could not squat, bend, reach, lean, stand, sit, or walk for long periods. He could lift ten pounds or less. He could walk one block and needed to rest for five to ten minutes before resuming walking. Also, Ramos claimed he could not remember, concentrate, or sleep well, and had difficulty following instructions and handling changes in his routine. He would forget spoken instructions quickly and had to read written instructions several times. Ramos got along well with authority figures. He handled stress with medications and by being alone. Ramos also claimed seeing shadows. Tr. 72-78, 517-523.

As to daily activities, Ramos ate his meals and took his medications, and spent his days lying down or watching television. His wife helped him with his personal care (dress, bathing, shaving). He needed to be motivated and reminded to take care of his needs, including medication intake. He did not cook, do house or yard work, go shopping, or socialize. He went out three to four times a month for medical appointments and could get around in a car but did not drive. He could count change but not pay bills, handle a savings account or use a checkbook because he had problems remembering and concentrating. Tr. 73-77, 518-522.

The Disability Determination Program ("DDP") referred the case to clinical psychologist Dr. Mariela León for a consultative psychological evaluation. Dr. León diagnosed on July 7, 2015 major depressive disorder, recurrent, with psychotic features. Prognosis was reserved. Dr. León noted that during the interview, Ramos exhibited moderate signs of depression. He was calm and cooperative during the evaluation, and his speech was coherent, relevant, and spontaneous. He was oriented in time, place, person, and circumstances. Ramos established a good rapport and showed effort in giving details about his medical and working history, and mental status. His psychomotor activity was adequate. There was no evidence of disorganization of thought process, ideas of reference, delusions, or suicidal or homicidal tendencies. Upon memory testing, his immediate and recent memory were good, and his short-term and long-term memory were excellent. His attention and concentration level and intellectual ability were excellent. Social judgment, however, was poor, and his mental health condition presented a severe impairment in social, occupational, and interpersonal functioning. Tr. 184-191, 692-699.

The case was also referred to Dr. David Blas for a consultative neurological evaluation of Ramos's chronic thoracic and lumbar musculoskeletal pain. Dr. Blas reported on July 17, 2015 that Ramos was alert, relevant, coherent, cooperative, and oriented in place, person, and time. He had good recent and past memory. Ramos showed normal motor and sensory functions. Ramos's spine showed no deviations. There was tenderness to palpation over the shoulders and thoracic and lumbar paraspinal muscles. Some ROM lumbar restrictions were present. Gait was normal. He did not favor a leg or limp and could stand over heels and toes. Lumbar spine flexion was at 65 (on a scale of 0-90). SLR test was negative. Tests for pathological reflexes in his hands (Babinski, Tinel, Phalen) were negative. Hand muscle strength was four out of five. Sensory functions were normal (intact to soft touch, pin prick, vibration, and proprioception). Dr. Blas assessed that Ramos's physical exam was remarkable for subtle bilateral hand weakness and tenderness to palpation over shoulders, thoracic, and lumbar paraspinal muscles. Ramos could sit, stand, walk, and travel. He could also handle and lift common objects. Ramos could bilaterally grip, grasp, pinch, finger tap, oppose fingers, button a shirt, pick up a coin, and write. Tr. 700-708.

The case was referred to Dr. Luis Umpierre, non-examining psychologist, for a mental RFC assessment. After considering Ramos's severe condition and allegations under listing 12.04 for affective disorders, Dr. Umpierre assessed on August 17, 2015 that based on the evidence in record, Ramos retained the RFC for simple, unskilled tasks. He could learn, understand, remember, and

execute simple and detailed instructions; maintain attention and concentration for at least two-hour periods with minimal interruptions due to his depressed mood; could perform at a consistent pace; could adjust to changes in work routines and environments; and could interact with public, co-workers, and supervisors. Tr. 341, 344-347, 367.

Under paragraph "B" criteria of listing 12.04, Dr. Umpierre found that Ramos had a mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration. Tr. 341, 361.

The case was also referred to Dr. Pedro Nieves, non-examining physician, for an internist evaluation. Dr. Nieves considered listing 1.04 for spine disorders and assessed on August 20, 2015 that the alleged effect of Ramos's impairments was not supported by the medical evidence. The record showed Ramos had normal gait, no foot drop or limping, no radicular signs, and normal motor strength of the extremities. Ramos retained the physical RFC for a full range of light work. Ramos could occasionally[3] lift and/or carry (including upward pulling) twenty pounds, and frequently[4] ten pounds; stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday; sit with normal breaks for a total of about six hours; push and/or pull unlimitedly, including operation of hand or foot controls; frequently climb ramps, stairs, ladders, ropes, or scaffolds; frequently balance, kneel, crouch or crawl; and occasionally stoop. Ramos did not have manipulative, visual, communicative, or environmental limitations. Tr. 341, 343-344, 714.

Ramos's claim for disability benefits was denied on August 21, 2015. Tr. 50, 349-350, 374.

Ramos requested reconsideration of the initial denial, claiming that all his conditions worsened, and reiterated what he reported in his first function report. Tr. 80-87, 353, 378, 525-542.

In a pain questionnaire dated October 5, 2015, Ramos described his neck, shoulders and low back pain as constant, acute, and pulsing, and lasting all day. The cervical pain radiated to his arms and shoulders, and his back pain radiated to his hips and legs. His legs would go numb and moving or standing for too long worsened the pain. The pain had changed within the last twelve months in that it was worse and now he also felt pain in the genital area. He reported that his pain

---

[3] "[O]ccasionally is cumulatively 1/3 or less of an 8 hour day." Tr. 343.
[4] "[F]requently is cumulatively more than 1/3 up to 2/3 of an 8 hour day." Tr. 343.

medications (Tramadol and Sulindac), and use of hot pads and ointments, were not very effective. Tr. 88-89, 543-544.

The case was referred to Dr. Jennifer Cortés for a non-examining psychiatric evaluation. On November 4, 2015, Dr. Cortés found that the medical evidence presented did not constitute a base to add mental limitations and affirmed the initial RFC assessment as written. Tr. 361-362, 367.

Dr. José González-Méndez, non-examining internist, affirmed the physical RFC as well. Tr. 363-364, 369, 833.

The case was also referred to Dr. Gary Spitz for a special sense review of Ramos's alleged visual impairment, who assessed on November 10, 2015 that Ramos's impairment was non-severe. Tr. 360-361, 835.

On November 12, 2015, the case was denied on reconsideration, with a finding that the previous determination denying Ramos's claim for disability benefits was correct. Claimant retained the RFC for light work. Tr. 54, 368-369, 379.

At his request (Tr. 427), a hearing before ALJ Gerard Picó was held on August 11, 2017. Ramos and vocational expert ("VE") Alina Kurtanich testified.[5] Tr. 36-49.

Ramos testified that he worked for seventeen years as a carpenter, but towards the end of that period, everything hurt, and he felt like he couldn't do the job anymore. His back started hurting first, followed by his arm, wrist, shoulders and neck. He was injected in the cervical area and prescribed medications for the pain. His medications did not help him much and he felt constant pain. He visited his attending physicians every three months or when needed. At home, he walked around the house and watched television, and sometimes helped his children water the plants. He didn't leave the house much. He also walked with pain, so he was limited to walking short distances and leaned on walls to rest a bit before continuing forth. He could lift about a half-gallon of milk, but not overhead. He did not have much strength in his hands. He could not drive. Tr. 39-45.

The ALJ offered to the VE that the claimant was a carpenter, with a vocational profile of four, semi-skilled position, medium work. The ALJ asked if a hypothetical person with claimant's vocational profile and the following limitations could work: lift, carry, or raise twenty pounds

---

[5] The hearing was held by video. Ramos appeared in Ponce, Puerto Rico. The ALJ presided from Columbia, Missouri. Tr. 18.

occasionally and ten pounds frequently; six for six hours in an eight-hour workday; stand and/or walk six hours; frequently climb ladders and ramps; frequently balance himself, kneel, crouch, and crawl; but occasionally bend down. The VE answered that there was work in the national economy that such a person could do with a vocational profile of two, unskilled position, light work, such as cleaner, inspector and hand packager, and garment sorter. Tr. 45-46.

The VE was then asked if such a person could work if he could additionally learn, understand, remember, and carry out simple and detailed instructions; maintain attention and concentration for two-hour periods; and interact with co-workers and supervisors, but only occasionally with the public. The VE answered that he could perform the jobs mentioned. The VE added that such a person was limited to standing and walking for four hours of the eight-hour workday. The VE answered that he could perform the sorter and inspector and hand packager jobs, but not the cleaner job, and that with the four-hour limitation he could also be an electronics worker. Tr. 46-47.

Counsel for Ramos asked the VE if a person that could not bend forward, needed at least two additional breaks during the day due to pain, and could interact for less than an hour in a workday with supervisors, co-workers, and clients, could work. The VE answered that there would be no jobs for such a person. Counsel also asked if this person could work if he could occasionally be in contact with supervisors and co-workers, but never clients, and needed two additional breaks at a minimum of thirty minutes each to rest. The VE answered that there would be no jobs for him to perform. Tr. 47-48.

On November 3, 2017, the ALJ found that Ramos was not disabled under sections 216(i) and 223(d) of the Act. Tr. 12-35. The ALJ sequentially found that Ramos:

(1) had not engaged in substantial gainful activity since his alleged onset date (Tr. 20);

(2) had a severe impairments which caused more than minimal functional limitations in his ability to perform basic work activities as required by SSRs 85-28 (L5-S1 central and lateral protrusion of the nucleus pulposum, causing compression of the thecal sac and nerve roots, osteophytosis of the posterior vertebral endplates at T8-9 impinging the spinal cord, central spinal canal stenosis at T10-11, and depression (Tr. 20);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526) (Tr. 21);

(4) retained the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) except he could lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk four hours and sit six hours in an eight-hour workday; frequently climb ramps, stairs, ladders, ropes, and scaffolds; frequently balance, kneel, crouch, or crawl; occasionally stoop or bend; frequently reach above shoulder level; able to use judgment to understand, remember, and carry out simple and detailed instructions; maintain concentration and attention for two-hour periods; and frequently interact with co-workers and supervisors, and occasionally with the public (Tr. 24). Therefore, he could not perform past relevant work (Tr. 29); but

(5) as per his age, education, work experience, and RFC, there was work that existed in significant numbers in the national economy that Ramos could perform, such as inspector and hand packager, garment sorter, and electronics worker. Tr. 29-30.

The ALJ considered Ramos's other conditions, including hypertension, diabetes mellitus, hypothyroidism, GERD, IBS, and decreased left eyesight, and found that these conditions were either controlled with treatment or that there was insufficient evident to establish severe impairments related to them. Tr. 20-21.

The ALJ considered at step three listings 1.04, 4.02, and 9.08. As to listing 12.04 for depressive, bipolar, and related disorders, the ALJ found that Ramos's condition did not satisfy the "paragraph B" or "C" criteria. Ramos had a mild limitation in understanding, remembering, or applying information. He showed no difficulties understanding and answering questions at the hearing, and the mental examinations contained in the record showed intact cognitive functioning. Ramos's ability to provide appropriate and relevant information to physical and mental examiners and during his testimony, and the record documents indicates he has adequate ability to perform at least simple, routine, and repetitive tasks, and to use reason and judgment to make work-related decisions in performing those tasks. Tr. 21-22.

Ramos was moderately limited in interacting with others. Ramos had anxiety problems that could affect his ability to relate and interact with co-workers, but he appropriately interacted with the ALJ at the hearing and with his medical examiners, and reported having had a good relationship with his family, friends and neighbors. Tr. 22.

Ramos had moderate limitation with his ability to concentrate, persist, or maintain pace. He was able to stay focused at the hearing, and exams showed that he was oriented and had intact cognitive findings (concentration, memory, attention, thought process, thought content, and insight

and judgment). Ramos therefore had the cognitive ability to focus on work activities and understand and do things in a consistent and timely manner. Tr. 22-23, 27. The ALJ discounted reports of difficulty with short-term memory, attention, and anxiety because these symptoms were not reported in the mental exams conducted by his treating doctors. Tr. 23.

Ramos had mild limitations in his ability to adapt and manage himself. Tr. 23.

As to "paragraph C" criteria, the ALJ found that the record did not contain evidence that Ramos relied on medical treatment, mental health therapy, psychosocial supports, or highly structured settings to diminish symptoms. Tr. 23.

The ALJ further found that claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but his statements about intensity, persistence, or limiting effects were inconsistent with the medical evidence. Physical exam findings were unremarkable and exams from 2013 through 2014 lacked ROM, sensory, motor strength, or deep tendon reflex findings that supported a disabling impairment. Records from 2014 through 2017 showed continuous treatment for his low back pain and other conditions, normal neurological findings, and normal findings of the extremities and eyes. Tr. 25. The record also contained many spine findings, but these were not significant or disabling. Tr. 26. Endocrine problems were stabilized with medications. Tr. 27.

The ALJ assigned great weight to the state consultants Dr. Nieves's and Dr. González's physical RFC assessments because these were consistent with the record as a whole. Tr. 27-28. The ALJ gave little weight to state consultative examiner Dr. Blas's opinion that Ramos could sit, stand, walk, travel, and handle and lift common objects because the spine symptoms and diagnostic findings supported at least a light work limitation. Tr. 28. The ALJ gave some weight to state consultative examiner Dr. León because his assessment that Ramos had a severe impairment in social, occupational, interpersonal, and other areas of functioning was not supported by the record. Tr. 28.

On March 2, 2019, the Appeals Council denied Ramos's request for review, rendering the ALJ's decision the final decision of the Commissioner. Tr. 1, 8, 478-482. The present complaint followed. Docket No. 1.

## DISCUSSION

Ramos claims that the ALJ failed to properly evaluate the medical evidence and gave less weight to portions of the consultative clinical psychologist Dr. León's report, and did not assign

weight to the opinions of the treating sources or medical evidence, ultimately resulting in an unsupported RFC assessment.

As to Ramos's arguments regarding weight of the evidence, that discretion lies with the ALJ. While a claimant is responsible for providing the evidence of an impairment and its severity, the ALJ is responsible for resolving any evidentiary conflicts and determining the claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *see also Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 12 (1st Cir. 1982). It was therefore the ALJ's duty to weigh all the evidence and make certain that the ALJ's conclusion rested upon clinical examinations as well as medical opinions. *Rodríguez v. Sec'y of Health & Human Servs.*, 647 F.2d 28, 224 (1st Cir. 1981). Regulations provide that the opinion of a treating physician is presumed to carry controlling weight as long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Diagnostic evidence does not receive an assigned weight, only medical opinions. 20 C.F.R. § 404.1527(c)(2).

In my review of the record, it is evident that the ALJ considered Ramos's complaints, and evidence from the treating, consultative, and non-examining physicians. The ALJ's decision does not contain a specific weight assigned to the evidence from the treating sources, but the ALJ summarized, analyzed, and considered those records at Tr. 20-27. Ramos's argument that the ALJ did not consider this evidence is without merit. The ALJ's lengthy summary of the treating, examining, and consultative opinions, and the ALJ's explanations of how these played into the RFC assessment, are sufficient to give the court notice of the treatment given to those medical opinions in the RFC assessment and final non-disability determination.

Moving on to the RFC finding analysis, the ALJ determined that through the date last insured, and based on the record evidence, Ramos retained the RFC to perform light work, except he could lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk four hours and sit six hours in an eight-hour workday; frequently climb ramps, stairs, ladders, ropes, and scaffolds; frequently balance, kneel, crouch, or crawl; occasionally stoop or bend; frequently reach above shoulder level; able to use judgment to understand, remember, and carry out simple and detailed instructions; maintain concentration and attention for two-hour periods; and frequently interact with co-workers and supervisors, and occasionally with the public. The hearing transcript shows that this RFC finding was used by the ALJ to pose the hypothetical questions to the VE.

Where, as here, an ALJ reaches step five of the sequential evaluation process, the burden of proof shifts to the Commissioner to show that a claimant can perform work other than her past relevant work. *Ortiz*, 890 F.2d at 524. The record must contain positive evidence to support the Commissioner's findings regarding the claimant's RFC to perform such other work. *See Rosado v. Secretary of Health & Human Servs.*, 807 F.2d 292, 294 (1st Cir. 1986). An RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (*citing* 20 C.F.R. §§ 416.927(e)(2), 416.946). But because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id.* Also, when determining which work-related limitations to include in the hypothetical question, the ALJ must: (1) weigh the credibility of a claimant's subjective complaints, and (2) determine what weight to assign the medical opinions and assessment of record. *See* 20 C.F.R. §§ 404.1527, 404.1529.

The record contains a lengthy history of treatment for physical and mental conditions that do not support Ramos's claims of disability. Based on the evidence contained in the record up to the decision date, as discussed below, I find that there is substantial evidence to support the ALJ's RFC finding.

Evidence of low back pain dates to 2000, with treatment from the SIF. Treatment at the SIF ended in 2003, and there is a gap in the evidence until 2013. Ramos continuously suffered from low back pain, which was treated with medications and physical therapy, with no worsening. CT scans and MRIs of the spine from 2014 on consistently showed in different areas of the spine protrusion of the nucleus pulposum which caused compression of the thecal sac, degenerative facet joint changes, and disc herniation. Surgery was not recommended. At all times throughout the record, Ramos was observed walking with a normal gait. Dr. Blas assessed that Ramos could sit, stand, walk, and travel. He could also handle and lift common objects. Ramos could bilaterally grip, grasp, pinch, finger tap, oppose fingers, button a shirt, pick up a coin, and write.

The evidence related to Ramos's thyroid problems were mostly contained in illegible handwritten notes and lab work or exams, but in sum appear to indicate that these conditions were being controlled by medications. Dr. Torres, gastroenterologist, noted in 2015 and 2016 that Ramos did well while taking medications. As to Ramos's vision, Dr. Spitz assessed that Ramos's visual impairment was non-severe.

As to Ramos's mental conditions, to satisfy the "paragraph B" criteria of listing 12.04, a claimant's disorder must result in an extreme limitation of one area, or marked restrictions in two of the following broad areas of functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation is when the claimant's ability to function independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.[6] Tr. 21. The record does not show marked or extreme limitations in any area.

The treatment record from the Ponce School of Medicine and Ponce Health Sciences University, from 2010 to 2017, and Dr. León's consultative examination show that while Ramos was depressed, his conditions did not impede him from working. At some point in 2010, 2013, and 2016 he reported having hallucinations, and having an instance in 2016 of cognitive difficulties in his short-term memory. However, overall, the record reflects a person whose attitude was alert and cooperative. He was oriented in time, place, person, and circumstances. His psychomotor activity was adequate. His mood was euthymic, and his affect was appropriate. There was no perceptual distortion. He did not have suicidal or homicidal thoughts. He acknowledged his problem (had insight), had adequate judgment and impulse control, and appropriate self-esteem. Dr. León noted that his memory was good, and his attention and concentration level and intellectual ability were excellent. Dr. Blas, consultative neurological examiner, also noted that Ramos's memory was good, and that he was alert, relevant, coherent, cooperative, and oriented. Dr. León also assessed

---

[6] In the five-point rating scale contained in 20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.00 Mental Disorders, the effects of a mental disorder are evaluated on each of the four areas of mental functioning based on a five-point rating scale consisting of none, mild, moderate, marked, and extreme limitation. "To satisfy the paragraph B criteria, your mental disorder must result in extreme limitation of one, or marked limitation of two, paragraph B areas of mental functioning. The five rating points are:
a. No limitation – A claimant is able to function in this area independently, appropriately, effectively, and on a sustained basis.
b. Mild limitation – A claimant's functioning independently, appropriately, effectively, and on a sustained basis is slightly limited.
c. Moderate limitation – Functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.
d. Marked limitation – Functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.
e. Extreme limitation – A claimant is not able to function in this area independently, appropriately, effectively, and on a sustained basis.

that his social judgment was poor but notes overall show he was open to and could relate to his interviewers. Notes from 2017 confirm that Ramos's condition was stable and was asymptomatic with therapy.

The treatment record also contains GAF scores of above 60.[7] I note that the ALJ did not use the GAF scores in his findings, but in conjunction with other evidence discussed above, they add support to the non-disability findings of Ramos's mental condition. "GAF is a scale from 0 to 100 used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults.'" *Hernández v. Comm'r of Soc. Sec.*, 989 F. Supp. 2d 202, 206 n. 1 (D.P.R. 2013) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*-IV 32 (4th ed. text rev. 2000) ("DSM–IV–TR")). A GAF score between 51 and 60 indicates 'moderate symptoms' or 'moderate difficulty in social occupational, or school functioning.'" *Hernandez v. Comm'r of Soc. Sec.*, 989 F. Supp. 2d 202, 206 f.n. 1 (D.P.R. 2013)(*quoting* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000) (DSM–IV–TR)). "A GAF score of 61-70 indicates: 'Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.' DSM-IV at 34." *Lopez v. Colvin*, No. 15-cv-30200-KAR, 2017 U.S. Dist. LEXIS 49183, at f.n. 5 (D. Mass. Mar. 31, 2017).

Ultimately, it is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence (*see Ortiz*, 955 F.2d at 769 (citing *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981); *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir. 1987)). After thoroughly and carefully reviewing the record, I find that there is substantial evidence to support the ALJ's RFC finding. The decision is therefore affirmed.

---

[7] The SSA's administrative memorandum AM-13066 advises adjudicators that a GAF score should not be dispositive of impairment severity. GAF scores were discontinued in the current Diagnostic and Statistics Manual of Mental Disorders (5th edition) ("DSM-V"), which was published in 2013, but were still part of the DSM-IV-TR during part of Ramos's treatment. Because the GAF scores are no longer used in the DSM-V, the SSA directed adjudicators through the AM-13066 to continue receiving and considering GAF scores as they would with other opinion evidence, but that the score must have supporting evidence to be given significant weight. *Valentín-Incle v. Comm'r of Soc. Sec.*, Civ. No. 15-2137 (MEL), 2018 U.S. Dist. LEXIS 215060, 2018 WL 6721340, at *10 n.2 (D.P.R. Dec. 19, 2018) (citations omitted).

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 31ˢᵗ day of March, 2021.


*s/Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge